975 A.2d 231

Kevin **BRIDGETT**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 0151, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 7, 2009.

Kenneth M. Berman and H. David Leibensperger, Baltimore, for appellant.

Wendy B. Karpel (Leon Rodriguez, Marc P. Hansen and Sharon V. Burrell, on the brief), Rockville, for appellee.

Panel: ZARNOCH, KEHOE and RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

ZARNOCH, Judge.

In this case, we consider whether the Circuit Court for Montgomery County was correct in granting appellee Montgomery County's motion for summary judgment and rejecting a Workers' Compensation Commission award made to appel-

lant Kevin Bridgett for the claimed occupational disease of Dupuytren's contracture.[1]   For reasons set forth below, we conclude that it was error for the court to grant summary judgment.  Thus, we reverse and remand the case for further proceedings.

## FACTS AND PROCEEDINGS

For more than 30 years, appellant was employed with the Montgomery County Fire and Rescue Services (MCFRS) as a firefighter[2] and later, a lieutenant in the River Rescue and Tactical Services (RRATS).[3]   In an affidavit filed in the circuit court, Bridgett described the employment conditions associated with service in RRATS:

All river rescue fire fighters must constantly hold a rope while under water in order to find their way back to the boat.... All river rescue fire fighters engage in underwater work which is mostly done with zero visibility and so the hands must be used to "visualize" everything under water. The hands must constantly be used to find objects and manipulate those objects under water to determine what they are .... all fire fighters are also constantly using their hands on an extensive basis to perform tasks such as removing ceilings, pulling hoses, pulling oneself into fire trucks, grasping tools, and pulling on doors, pipes and other objects.... The overuse of the hands is a condition of employment that is common to all fire rescue fighters.[4]

---

1.  Dupuytren's contracture is a hand condition named for Napoleon-era French surgeon, Guillaume Dupuytren.  *Dorland's Illustrated Medical Dictionary* (29th Ed. 2000) at 550.

2.  Bridgett also served as a firefighter for four years before joining MCFRS.

3.  The history of RRATS' development from "a handful of personnel" to a "highly skilled team of nearly 50 rescue professionals" is described on a link to the MCFRS website at http://www.rrats.org.

4.  The Maryland Fire and Rescue Institute, established by Md.Code (1978, 2008 Repl. Vol.) Education Article § 13–103, offers training programs for swiftwater rescue technicians.   Http://www.mfri.org/cgi-

Appellant described his working conditions in similar terms at a June 2007 hearing before a Workers' Compensation Commissioner.[5] At the same hearing, Bridgett said that eventually he "got a big lump in the palm of [his] hand."

In April 2007, appellant filed a claim with the Workers' Compensation Commission alleging: "I developed Dupuytren's contracture as a result of many years (over 35) of use of hands grasping, pulling and hand manipulations as a firefighter." Appellee responded by indicating it would be contesting issues. Two and a half-months later, at a hearing before Commissioner Sfekas, medical evidence was offered by both sides.

Bridgett's orthopedic surgeon, Dr. Sunjay Berdia, said in a letter that appellant developed Dupuytren's contracture of his right hand. He observed:

---

bin/course details. One such program covers such topics as "swift water operations, pre-incident planning, incident management, hazard mitigation, mechanical advantage rope systems, highline rescue systems, mock night search, and other advanced rope rescue skills." *Id.*

5. At that time, the following exchange occurred between Bridgett and his counsel:

Q. ... As a firefighter over the last 35 years how did you use your right hand?

A. Multi-tasking: grabbing, removing ceilings, pulling hoses, pulling myself into the fire truck, grasping, pulling items. For the past 20 years of that I was also a public safety diver.

Q. Explain to Commissioner Sfekas what it means to be a public safety diver for Montgomery County Department of Fire and Rescue.

A. As a public safety diver for Montgomery County you recover victims' bodies, evidence for the police department. Anything that falls in the water that needs to be recovered, the public safety diver would be trained to do that. We dive in zero visibility water. All of your items you find are visualized with your hands, so it's all hand manipulation under water. You can see nothing. You find things with your hands and determine what they are.

Q. Is there also rope involvement as a rescue diver?

\* \* \*

A. That's my only way of what they call to get back to shore is through the line that I'm tethered to, so I'm constantly holding a rope to find home.

As you know Dupuytren's contracture is due to the disease myelo fibroblast. This in itself proliferates and causes fascial contractures which initially result in nodules and then subsequently can result in contractures of the fingers. Although there is a certain genetic predisposition of developing Dupuytren's contracture, we also believe that in the majority of patients, there is usually an inciting event such as either trauma or overuse of the palmar skin. Given the fact that Mr. Bridgett has been a firefighter for over 35 years in which he has been grasping and pulling ropes and in addition doing similar activities while he was on a rescue dive team for the last 16 years, I feel that Mr. Bridgett's development of Dupuytren's contracture, within a reasonable degree of medical probability is more likely than not (greater than 51%) due to his duties as a fire fighter.

Appellee countered with a letter from a hand specialist, Dr. Peter Innis, who after examining Bridgett, noted:

I am forwarding for your review a pamphlet that the patient was reading in our office, which is put out by the American Society for Surgery of the Hand, which is our national organization. This pamphlet entitled: "Dupuytren's Disease" states under the section "What causes it?" "There is no proven evidence that hand injuries or specific occupational exposure lead to a higher risk of developing Dupuytren's disease." I agree with this statement, and it is my opinion within a reasonable degree of medical certainty that this very pleasant gentleman had a right palmar nodule consistent with Dupuytren's disease, which was not related to his work as a fire and rescue lieutenant.

On June 20, 2007, Commissioner Sfekas issued an award of compensation to Bridgett. In ordering the payment of benefits, the Commission order said:

The Commission finds on the issues presented that the claimant sustained an occupational disease arising out of and in the course of employment, that the first date of disablement was December 15, 2005, that the disability of the claimant (Dupuytren's contracture; right/wrist) is the

result of the occupational disease, and that as a result thereof the claimant was temporary totally disabled from December 15, 2005 to December 30, 2005 inclusive.

On July 11, 2007, Montgomery County filed a petition for judicial review of the Commission's decision and a request for jury trial. Appellant answered. Four months later, the County filed a motion for summary judgment. Appellee submitted no new evidence, but argued as a matter of law that Bridgett had not suffered a compensable injury as defined by § 9–502(d)(1)(i) of the Labor and Employment (L & E) Article of the Md.Code (1991, 2008 Repl. Vol.), and as interpreted by the Court of Appeals in *King v. Bd. of Ed. of Prince George's County,* 354 Md. 369, 731 A.2d 460 (1999);[6] and 2) that the claimant's Dupuytren's contracture did not amount to a compensable occupational disease.[7] Specifically, appellee argued that "the issue is not whether ... Bridgett excessively used his hands, but whether firefighter[s] as a class excessively use their hands during the course of their employment." The County added that to qualify as a compensable occupational disease, the condition "must not only be *inherent* in the nature of the claimant's job, but the disease also *cannot occur with equal-frequency* in any other employment ..." and that the appellant failed this test. The appellee also argued that the Workers' Compensation Act was not meant to cover "the common perils of life" and that the overuse of hands was just such an activity. Solely for purposes of the summary judg-

---

**6.** Section 9-502(d)(1)(i) states:

An employer and insurer are liable to provide compensation under subsection (c) of this section only if:

(1) the occupational disease that caused the death or disability:

(i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement....

**7.** Section 9-101(g) of the L & E Article provides:

"Occupational disease" means a disease contracted by a covered employee:

(1) as the result of and in the course of employment; and

(2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated.

ment motion, the County said it would "accept Mr. Bridgett's contention that the [D]upuytren's contracture of his right hand/wrist was caused by use of [his] hands."

Appellant opposed these contentions and submitted an affidavit of Bridgett, the award of the Workers' Compensation Commission, Montgomery County Class Specifications for Firefighter/Rescuer I, II, and III, the written evaluation of Dr. Berdia, and the transcript of testimony before Commissioner Sfekas. Specifically, appellant argued that under L & E Article, § 9–745(b), as interpreted by the Court of Appeals in *Baltimore County v. Kelly*, 391 Md. 64, 891 A.2d 1103 (2006), the Commission's award in Bridgett's favor was prima facie correct and sufficient to defeat appellee's motion for summary judgment.[8] He also contended that the evidence he had presented created material disputes of fact not resolvable by summary judgment.

On February 28, 2008, the circuit court heard argument on the motion and issued its ruling:

All right. Okay. I think the *King* case is applicable here and I will grant the motion for summary judgment.

On March 12, 2008, an order was entered granting the summary judgment motion and remanding the case to the Workers' Compensation Commission "for the entry of an award affirming its decision to disallow the claim [*sic*] filed here ...." Two days later, Bridgett noted his appeal.

## QUESTIONS PRESENTED

Appellant raises the following questions:

I. Whether in an appeal of a workers' compensation decision where the Claimant was successful before the Worker's Compensation Commission in a full evidentiary Hearing and the Employer/Self–Insurer appealed to the Circuit Court and presented no new evidence, under

---

8. Under § 9–745(b) "[i]n each court proceeding under this title: 1) the decision of the Commission is presumed to be prima facie correct; and 2) the party challenging the decision has the burden of proof."

*Baltimore County v. Kelly*, 391 Md. 64, 891 A.2d 1103 (2006) and its progeny, which preclude summary judgment at such a stage, the Circuit Court's granting of summary judgment in favor of the appealing party (the Employer/Self–Insurer) was erroneous?

II. Whether in an appeal of a workers' compensation decision where the Claimant was successful before the Workers' Compensation Commission and the Employer/Self–Insurer appealed to the Circuit Court, granting summary judgment to the appealing employer was erroneous where there was a material dispute of fact as to whether the claimant's Dupuytren's contracture was due to the nature of the employment as a fire fighter given that there was evidence that the hazards of the occupational disease (overuse of the hands) exist in that occupation?

Appellee frames the issues in this fashion:

I. Did the circuit court correctly grant summary judgment to the County where Mr. Bridgett's Dupuytren's contracture was not due to the nature of an employment in which hazards of the occupational disease exist?

II. Did the circuit court properly grant summary judgment where the Workers' Compensation Commission's decision was not supported by minimum evidence sufficient for a prima facie case? [9]

## DISCUSSION

Under Md. Rule 2–501(f), a court may not grant summary judgment unless there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In considering the motion, the court views the facts, including all inferences, in the light most favorable to the non-moving party. *Sadler v. Dimensions Healthcare Corp.*, 378

---

[9]. In its brief at page 3 and pages 9–11, the County also appears to argue that Dupuytren's contracture is not an occupational disease under § 9–101(g) of the L & E Article.

Md. 509, 536, 836 A.2d 655 (2003). In reviewing the granting of a motion for summary judgment, we must determine whether the decision was legally correct and our review is confined to the basis relied upon by the court below. *Id.*

In this case, by its exclusive reliance on *King, supra,* the circuit court appears to have based its summary judgment decision solely on Bridgett's asserted failure to show that his condition was compensable under L & E Article, § 9–502(d)(1)(i), because it was not "due to the nature of an employment in which hazards of the occupational disease exist." Thus, the County's contentions that Dupuytren's contracture is not an occupational disease of Bridgett's job as determined by the Commission and that the Commission's award was not supported by sufficient evidence to warrant its acceptance as prima facie correct would seem, at first blush, not to be before us. However, because of appellant's understandable reliance on the Commission's award to survive summary judgment and its express rejection in the court's March 12, 2008 order, the County's contentions are necessarily entwined with the compensability issue. For these reasons, it is permissible for us to consider all of these questions. *See Conaway v. Deane,* 401 Md. 219, 243–44, 932 A.2d 571 (2007). The logical place to begin our analysis is a consideration of the impact of the Commission's award in a summary judgment setting.

## 1. Effect of the Commission's Award

Section 9–745(b) of the L & E Article states:

In each court proceeding under this title:

(1) the decision of the Commission is presumed to be prima facie correct; and

(2) the party challenging the decision has the burden of proof.

As Maryland courts have interpreted this provision, when a claimant prevails before the Commission and the matter comes before the circuit court, the administrative decision is the claimant's prima facie case. *Kelly,* 391 Md. at 75–76, 891

A.2d 1103; *Smith v. Howard County,* 177 Md.App. 327, 338, 935 A.2d 450 (2007). As such, the claimant generally cannot suffer a summary judgment or a directed verdict against the employee on the grounds that he or she failed to produce a prima facie case. *Smith,* 177 Md.App. at 338, 935 A.2d 450.

There are some important exceptions to this rule. Prima facie correctness is denied to a Commission decision not based on its actual "consideration of conflicting evidence as to essential facts or the deduction of permissible but diverse inferences therefrom...." *Moore v. Clarke,* 171 Md. 39, 45, 187 A. 887 (1936). *See Kelly,* 391 Md. at 75–77, 891 A.2d 1103; *Smith,* 177 Md.App. at 338, 935 A.2d 450. In addition, the Commission's decision does not make the claimant's prima facie case if the agency did not have before it "the minimum evidence necessary to support an award." *Dove v. Montgomery County,* 178 Md.App. 702, 724–25, 943 A.2d 662 (2008)(*quoting Larson's Workers' Compensation Law,* § 130.06[3][a](2006)). This burden is "slight," *Smith,* 177 Md.App. at 332, 935 A.2d 450, but means at least "proving a case beyond speculation and conjecture." *Larson, supra* at § 130.06[1][a] and [3][a]. Finally, a Commission decision would not be invulnerable from attack by summary judgment if the contention raised is a legal ground. *Kelly,* 391 Md. at 78, 891 A.2d 1103; *Marshall v. Univ. of Md. Med. Sys. Corp.,* 161 Md.App. 379, 382, 869 A.2d 391 (2005). We find none of these exceptions applicable in this case.

## 2. Conflicting Evidence/Legal Grounds

This was a contested case before the Commission. Medical evidence was offered by both sides, with sharp disagreement over whether Dupuytren's contracture was an occupational disease and whether the condition arose from Bridgett's employment as a firefighter/rescue diver. *See* pp. 3–4 *supra.* The claimant also testified on these matters. In addition, the issues of whether the appellant had an occupational disease under § 9–101(g) of the L & E Article and of whether it was compensable under § 9–502(d)(1)(i) were primarily fact-driven and were not purely questions of law.

### 3. Minimum Evidence Before the Commission

To address the question of whether there was minimum evidence before the Commission to support its award, we first consider whether Dupuytren's contracture could ever be an occupational disease.[10] Although this issue may be a novel one in Maryland, a cursory review of out-of-state cases discloses that the question was first litigated more than 75 years ago, *see John Reardon's Case,* 275 Mass. 24, 175 N.E. 149 (1931), and continues to be contested today, *see Hollingsworth v. Goodyear Tire & Rubber Co.,* 183 N.C.App. 154, 643 S.E.2d 675, 2007 WL 1247050 (N.C.App.2007),[11] with mixed results.

In *John Reardon's Case, supra,* the Supreme Judicial Court of Massachusetts rejected the workers' compensation claim of a moulder, noting that Dupuytren's contracture "is not a condition peculiar to the trade of a moulder; it is occasioned by any work continued over a period of years that requires the grasping of any article which causes a continuous pressure upon the palm of the hand." 175 N.E. at 150. In *Ehman v. Dept. of Labor & Indus.,* 33 Wash.2d 584, 206 P.2d 787 (1949), the Supreme Court of Washington upheld an administrative order denying compensation to an employee who claimed to have developed Dupuytren's contracture because, for more than 20 years, he lifted and carried bundles of wooden flooring. After summarizing evidence in the record that "many persons suffer from the disease who have not been engaged in occupations which would be likely to result in traumatic injury to the hands," *Id.* at 791, the appellate court said that "[t]he most that can be said is that respondent's unfortunate physical condition may be or possibly is an occupational disease. This is not sufficient ..." *Id.* at 797. *See also Berlett v. State,* 20 Ill. Ct. Cl. 238 (1951)(denying benefits to an employee who

---

10. The County did not contest in the circuit court the Commission's finding on causation. *See* pp. 5–6.

11. *Hollingsworth* is a "reported", but unpublished decision, whose text is available at 2007 WL 1247050, 2007 N.C.App. Lexis 855 (N.C.Ct.App. May 1, 2007).

claimed to have developed Dupuytren's contracture from operating a jack hammer).

On the other side of the ledger is *Walsh v. Kotler*, 43 N.J.Super. 139, 127 A.2d 918 (Sup.Ct.1956), where a New Jersey court found that an employee's Dupuytren's contracture "was precipitated, and then aggravated and accelerated by his work as a roofer." *Id.* at 922. In *In re: Rogan v. Charles F. Noyes, Inc.*, 10 A.D.2d 765, 197 N.Y.S.2d 758 (1960), a New York court upheld a worker's compensation award to a porter who suffered from Dupuytren's contracture. And in *Hollingsworth, supra,* the Court of Appeals of North Carolina held that a decision of the North Carolina Industrial Commission that a first-stage tire builder developed Dupuytren's contracture from his occupation was supported by medical evidence.[12] *See also Larson's at* § 52.06[3].

Perhaps the best explanation for this diversity of opinion is found in *In re: Hickey v. Ardale Bldg. Corp.*, 15 A.D.2d 837, 224 N.Y.S.2d 939, 940 (1962), when the court noted:

It is obvious that all cases involving Dupuytren's contracture are not necessarily compensable. Nor does the fact that the claimant's actions involved the use of his hands necessarily dictate recovery. In each instance it is for the board *on the basis of the evidence before it* to determine if the necessary causal relationship has been established. (Emphasis added.).

In short, the authorities would seem to indicate that there is no *per se* exclusion of Dupuytren's contracture from the

---

12. Among the medical evidence summarized by the court was the testimony of one doctor who said "it was generally understood and accepted in the medical community that the disease is caused by a combination of inherent factors and environmental factors, such as repetitive trauma to the hands." *Hollingsworth*, 2007 WL 1247050 at *2, 2007 N.C.App. Lexis 855 at 6. Later in its opinion, the court noted that testimony before the commission showed that the claimant's employment "caused or significantly contributed to the development of his Dupuytren's contractures," *id.* 2007 WL 1247050 at *5, 2007 N.C.App. LEXIS 855 at 13–14, and that this testimony took the case out of "the realm of conjecture." *Id.* 2007 WL 1247050 at *5, 2007 N.C.App. LEXIS 855 at 14.

category of occupational diseases and that whether it is a risk of a particular occupation turns on the facts of each case. This caselaw also suggests that it was not beyond speculation and conjecture for the Workers' Compensation Commission, after weighing the conflicting evidence before it—much like that considered in the above cases—to find that Bridgett had suffered from an occupational disease.

### 4. Compensability of the Occupational Disease

The key issue in this case is whether the Commission had before it minimum evidence that Bridgett's Dupuytren's contracture was due to the nature of an employment in which hazards of the occupational disease exist. Montgomery County suggests the issue is primarily one of statutory construction. However, whether an occupational disease is compensable under § 9–502(d)(1)(i) of the L & E Article is primarily controlled by the facts. This is no more evident than in *King*, *supra*, the case relied on by the circuit court in its summary judgment ruling and by the appellee here.

*King* involved an overworked transportation assistant for the county board of education performing the jobs of three people in scheduling the transportation of school children. She filed a workers' compensation claim, asserting that, as a result of her employment, she suffered a stress-induced mental condition. Her contention was rejected by the Commission, by the circuit court, by this Court, and the Court of Appeals. The claimant was held not to satisfy the standards of § 9–502(d)(1)(i) that her condition was "due to the nature of an employment in which hazards of the occupational disease exist." Specifically, the Court of Appeals noted:

> King can not satisfy this threshold requirement. Her evidence and arguments before both the Commission and the circuit court indicate that she was an overworked employee in a mismanaged position. She presented no direct evidence that the stress-related illnesses of somatization disorder and/or major depression were somehow inherent in the nature of the position of transportation assistant. Nor did she present evidence that these illnesses would not

occur in equal frequency in any other occupation in which employees were overworked and/or mismanaged.

Instead of presenting evidence of the hazards inherent in the occupation of transportation assistant, King presented evidence of the hazards in her specific job. Such evidence is consistent with her claim that when the Legislature used the phrase "due to the nature of an employment in which hazards of the occupational disease exist," it intended to equate "employment" with a specific job. This argument is contrary to Maryland law. "Employment" in the context of § 9–502(d)(1)(i) does not mean the specific job in which the person is working; it means the profession or general occupation in which the person is engaged.

Because King failed to present any evidence that somatization disorder and/or major depression may be reasonably characterized as due to the general character of her employment as a transportation assistant, the circuit court properly granted Respondent's motion for summary judgment.

354 Md. at 381–82, 731 A.2d 460.

There is a critical difference between *King* and this case. The claimant in *King* did not have the evidentiary boost of a Commission award. That award can defeat summary judgment even if the evidence before the Commission was "slight." *See* p. 10, *supra.* In *King*, without a favorable Commission decision, the claimant had to show more, because the mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to preclude the grant of summary judgment. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993).

There is also a dramatic variance between the two cases with respect to the nature and strength of the evidence. *King* was a case where the claimant's stress-related condition arose from a mismanaged position and her individual susceptibility, not from the performance of duties inherent in the occupation. In Bridgett's case, according to evidence before the Commission, the claimant was doing exactly what his position re-

quired. The claimant testified how he had to use his hands to hold ropes in river rescue operations.

On the basis of *King,* the County argues that "overuse of the hands" is not a hazard of the general occupation of firefighters any more than it is of any other employment and that river rescue duty was Bridgett's "specific job," not his "general employment." However, although appellant attempted to connect Dupuytren's contracture with the duties of a firefighter, his stronger (and alternative) contention was that the condition stemmed from his rescue duties, a clearly legitimate subclass of the County's Fire *and* Rescue Services. *See* pp. 1–2, *supra.* And his medical evidence appeared to confirm that connection. Dr. Berdia stated that "grasping and pulling ropes" resulted in "either trauma or overuse of the palmar skin" and was an "inciting event" for the development of Dupuytren's contracture.[13]

Nor can appellee draw solace from *King's* reference to the transportation assistant's failure to present evidence that her mental illness "would not occur in equal frequency in any other occupation." 354 Md. at 381, 731 A.2d 460. In context, this statement could be reasonably read as simply describing another way the claimant could have shown that the hazards of the condition were "inherent" in the position of transportation assistant—an evidentiary gap that is not apparent in the Commission's decision here.[14]

---

**13.** Appellee reads too much into *King's* distinction between a "general occupation" and an individual "job." In the context of that case, the Court of Appeals was focusing on the *unnecessary* burdens imposed on the position by *King's* supervisor and her *unnecessary* acceptance of them. There is nothing unnecessary about Bridgett's grasping and pulling ropes as a river rescuer. Moreover, this hazard of the position is different in character from the general run of occupations.

**14.** It is noteworthy that Larson's treatise on workers' compensation does not regard statutory provisions such as § 9–502(d)(1)(i) of the L & E Article as requiring the disease to originate exclusively from the particular kind of employment in which the employee is employed. *Larson's, supra,* at § 52.03[3][c]; *Mulder v. Liberty Northwest Ins. Co.,* 135 Idaho 52, 14 P.3d 372, 375 (2000).

■ In summary, there was at least a minimum amount of evidence before the Commission on the compensability of Bridgett's Dupuytren's contracture. It was not beyond speculation and conjecture for the agency to conclude that the hazard of developing this condition was inherent in the claimant's position as a rescue diver. Because there was nothing clearly deficient about the Commission's decision in Bridgett's case, the agency's award was prima facie correct and sufficient to defeat appellee's motion for summary judgment.[15] In so concluding, we express no view on the appropriate outcome of this litigation after a full trial.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.

---

**15.** Because we conclude it was error for the circuit court to disregard the prima facie correctness of the Commission's decision, there is no need to decide whether the evidence appellant submitted in the circuit court would have been sufficient to counter the summary judgment motion.